UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

№ 13-CV-4901 (JFB)

LINDA SCHNEIDER,

Appellant,

VERSUS

R. KENNETH BARNARD,
AS CHAPTER 7 TRUSTEE OF JANITORIAL CLOSE-OUT CITY CORP., ET AL.,

Appellee.

**MEMORANDUM AND ORDER**
April 2, 2014

JOSEPH F. BIANCO, District Judge:

This bankruptcy appeal arises out of the involuntary bankruptcy proceedings of debtors Janitorial Close-Out City Corp. ("Janitorial"), Eager Beaver Realty, LLC ("Eager Beaver"), All Clean Supplies, LLC ("All Clean LLC"), Sax and Sounds Productions, LLC ("Sax and Sounds"), Ultimate Sax & Sounds Entertainment Corp. ("Ultimate Sax"), All-Clean Janitorial Supply, LLC ("All-Clean Janitorial"), and All Clean Supplies Corp. ("All Clean Corp.") (collectively, "debtors") in the United States Bankruptcy Court for the Eastern District of New York (the "Bankruptcy Court"). On April 28, 2011, R. Kenneth Barnard (the "Trustee" or "Appellee"), as trustee of debtors, commenced an adversary proceeding against Linda Schneider ("Schneider" or "Appellant") to recover certain funds transferred by debtors to Schneider. The Trustee alleged that Schneider's daughter, Laurie Schneider ("Laurie"), had operated debtors as a Ponzi scheme and had transferred the funds at issue to Schneider in furtherance of that Ponzi scheme. Following a one-day trial, the Bankruptcy Court concluded that the Trustee was entitled to avoid a total of $185,612.00 in transfers from debtors to Schneider pursuant to the fraudulent conveyance laws of the Bankruptcy Code and the New York Debtor and Creditor Law ("DCL"). Specifically, the Bankruptcy Court held that (1) the transfers at issue were actually fraudulent because they were made on or after January 1, 2007, while Laurie was operating debtors as a Ponzi scheme, (2) in the alternative, these transfers were constructively fraudulent, and (3) Schneider was not entitled to the transferee's affirmative defense of good faith.

1

On appeal, Schneider contends that the following factual findings and legal conclusions of the Bankruptcy Court constitute reversible error: (1) the Ponzi scheme presumption, according to which transfers made by a Ponzi entity are presumed to have been made with actual fraudulent intent under the Bankruptcy Code and DCL, applied to the transfers at issue here because (a) Laurie began operating a Ponzi scheme on January 1, 2007; and (b) the transfers were made in furtherance of that Ponzi scheme; (2) DCL § 276, New York's actual fraudulent conveyance statute, does not require proof of a transferee's fraudulent intent; and (3) the transfers at issue were constructively fraudulent, and Schneider was not entitled to the affirmative defense of good faith, because she had not provided fair consideration for the transfers at issue. For the following reasons, this Court determines that none of Schneider's arguments have merit, and affirms the judgment of the Bankruptcy Court. First, based on the evidence in the record—in particular, evidence concerning debtors' finances—the Court cannot conclude that the Bankruptcy Court committed clear error in finding that Laurie began operating a Ponzi scheme on January 1, 2007. Moreover, because the transfers at issue enabled Laurie to extract value from the Ponzi entities and maintain the Ponzi scheme, debtors made the transfers at issue in furtherance of a Ponzi scheme. Accordingly, the Bankruptcy Court properly applied the Ponzi scheme presumption to all transfers made by debtors to Schneider on or after January 1, 2007. Second, employing normal principles of statutory construction, the Court concludes that DCL § 276 does not require proof of the transferee's fraudulent intent. Thus, the Bankruptcy Court properly held the transfers at issue were avoidable under DCL § 276. Third, the Court affirms the Bankruptcy Court's finding that Schneider failed to provide fair consideration to debtors in exchange for the transfers at issue. Specifically, although debtors apparently transferred $158,612.00 to Schneider in exchange for Schneider's provision of housing to Laurie and her husband, debtors themselves did not receive any benefit from the exchange. Moreover, the Bankruptcy Court did not commit clear error in finding that Schneider provided nothing to debtors in exchange for the other $27,000.00 transferred to her. On this basis, all transfers at issue were constructively fraudulent, and Schneider could not establish the affirmative defense of good faith.

I. BACKGROUND

A. Facts

The following facts are drawn from the Bankruptcy Court's findings of fact in its June 24, 2013 order ("Bankr. Ct. Op."), as well as other facts that were admitted in evidence at the trial and are in the appellate record.

1. Debtors

Debtors' businesses fall generally into three categories. First, Ultimate Sax provided music and entertainment services for corporate and private clients. (Bankr. Ct. Op. at 3.) Laurie formed Ultimate Sax as a New York corporation in 2002. (*Id.*) Sometime in 2005, Sax and Sounds began operating as a successor entity to Ultimate Sax. (*Id.*) Second, All Clean Corp., All-Clean Janitorial, and Janitorial all purported to sell janitorial supplies at the wholesale level. (*Id.* at 3–4.) In addition to the wholesale of janitorial supplies, Janitorial's stated purpose was to purchase industrial equipment and machinery from China for resale in the United States. (*Id.* at 4.) Laurie formed these three companies between 2002

2

and 2006. (*Id.* at 3–4.) In addition, in August 2008, Laurie told an investor that All Clean LLC was a New York limited liability company; however, it is unclear whether All Clean LLC ever existed as a separate entity from Laurie's other janitorial supply companies. (*Id.* at 4.) Third, Eager Beaver, which Laurie formed in or around May 2006, had the stated purpose of purchasing and selling foreclosed residential properties. (*Id.* at 3–4.)

Laurie was a principal and officer of each debtor. (*Id.* at 4.) Her husband, Christopher Laybourne ("Laybourne"), who is a musician, was employed by one or more debtors. (*Id.* at 2–3.) Tax records also indicate that Laybourne owned 100% of Sax and Sounds from 2004 to 2006. (R-2,[1] Aff. of Esther DuVal, Jan. 31, 2013 ("DuVal Aff.") ¶ 9.) Debtors paid salaries to Laurie and Laybourne, which debtors recorded as compensation in their financial records. (Bankr. Ct. Op. at 3.)

2. The Ponzi Scheme

Between 2003 and 2006, Laurie sought investments to finance debtors' purchases of (1) janitorial supplies, (2) industrial equipment and machinery from China, (3) and foreclosure properties in Nassau and Suffolk Counties in New York. (*Id.* at 4.) Beginning in 2006, Laurie entered into written agreements with investors, pursuant to which investors were guaranteed rates of return ranging from 36% to 200%. (*Id.* at 4–5.) The first investor agreement was executed on June 6, 2006; that investor was repaid in full, with interest, on December 6, 2006. (*Id.* at 5.) The next investor agreement was executed on January 1, 2007. (*Id.*)

Thereafter, from January 2007 to January 2009, Laurie entered into almost two hundred additional investment agreements on behalf of various debtors. (*Id.*) In total, the written investment agreements represented $37.2 million in investments and promised $9.8 million in guaranteed profits (a 26.2% average return on investment). (*Id.*)

According to an analysis of debtors' financial records performed by Certified Public Accountant Esther DuVal ("DuVal")—analysis upon which the Bankruptcy Court relied (*see id.* at 6)— debtors disbursed almost all cash received from 2007 to 2009, their "obligations to existing investors exceeded the cash balance at all points in time, on a monthly basis from 2007 through 2009," and "both the deficit and the obligations due grew steadily over time" (DuVal Aff. ¶¶ 40–41). In other words, from 2007 to 2009, debtors continued to solicit new investments but "did not maintain sufficient cash to meet the minimum investment principal obligations reflected in the investors agreements," let alone the guaranteed profits. (*Id.* ¶ 65.) Consequently, DuVal determined that debtors "had no way of meeting the investor obligations without using money raised from new investors to pay out older investors." (*Id.* ¶ 70.) Based on her financial analysis, DuVal opined, and the Bankruptcy Court concluded, that Laurie operated debtors as a Ponzi scheme designed to defraud investors. (*Id.* ¶¶ 5, 78; Bankr. Ct. Op. at 6.).[2]

---

[1] "R-__" refers to the numbered documents in the record filed with the Court on August 30, 2013. (*See* ECF No. 1.)

[2] On January 26, 2012, a grand jury returned an indictment charging Laurie with three counts of wire fraud. (*See* Indictment, *United States v. Schneider*, No. 12-CR-74 (DRH)(AKT) (E.D.N.Y. Jan. 26, 2012).)

3

### 3. Debtors' Transfers to Schneider

#### a. The 2003 Loan and 2004 Transfer

In 2003, Schneider transferred between $50,000 and $60,000 to Laurie, so that Laurie could finance her businesses (the "2003 Loan"). (Bankr. Ct. Op. at 6.) When Schneider learned that Laurie was receiving funds from outside investors, she demanded repayment of the 2003 Loan. (*Id.* at 6–7.) On April 21, 2004, All Clean Corp. transferred $35,000 to Schneider, apparently as repayment for the 2003 Loan from Schneider to Laurie (the "2004 Transfer"). (*Id.* at 7.)

#### b. The Rent Transfers

In 2005, Schneider purchased a single-family home in Oceanside, New York (the "Oceanside Property") as an investment property for $705,000. (*Id.*) She financed the purchase with her inheritance from her grandfather's estate and two loans: one secured by a mortgage on the Oceanside Property, and the other secured by a junior mortgage on Schneider's primary residence. (*Id.*) Schneider testified that she intended for Laurie and Laybourne to live in the Oceanside Property, and that she purchased the Oceanside Property in part because it had room for a sound studio for Laybourne. (*Id.*)

Laurie and Laybourne moved into the Oceanside Property in March 2005 and lived there until October 2012. (*Id.*) No written lease was ever executed. (*Id.*) In fact, neither Laurie nor Laybourne ever paid rent. (*Id.*) Instead, between March 2005 and January 2009, debtors Sax and Sounds, All Clean Corp., All Clean Janitorial, Eager Beaver, and Janitorial made a total of twenty-seven transfers to Schneider totaling $192,091.58 (the "Rent Transfers"). (*Id.*) Schneider testified at trial that the Rent Transfers represented the rent for the Oceanside Property, and she reported the Rent Transfers on her tax returns for the years 2004 to 2009. (*Id.*) In addition, the parties agreed at trial that the Rent Transfers represented the approximate fair market rental value of the Oceanside Property. (*Id.* at 9.)

According to her trial testimony, Schneider believed that debtors made the Rent Transfers so that Laurie and Laybourne could live in the Oceanside Property, and that debtors intended the Rent Transfers to be part of Laurie's and Laybourne's compensation. (*Id.*) However, neither Laurie nor Laybourne reported the Rent Transfers as income on their joint tax returns for the years 2005 to 2007.[3] (*Id.* at 8.) Moreover, debtors did not record all Rent Transfers in their financial records, and those that debtors did record were categorized as either balance sheet liabilities or rent, but not compensation to Laurie or Laybourne. (*Id.*)

#### c. The 2009 Transfers

Sometime in early 2009, Laurie told Schneider that debtors were in dire straits. (*Id.*) In an attempt to help her daughter, Schneider added herself as a signatory to the bank accounts of several debtors. (*Id.*) A personal account was also set up in Schneider's name ("Schneider's Chase Account"). In February 2009, Schneider began exercising control over three of debtors' bank accounts and writing checks on their behalf. (*Id.* at 8–9.) Between February 17 and April 8, debtors All-Clean Janitorial and Sax and Sound made three transfers to Schneider's Chase Account totaling $77,000 (the "2009 Transfers"). (*Id.* at 9.) Schneider transferred $50,000 of the

---

[3] These were the only tax returns in evidence before the Bankruptcy Court. (*See* Bankr. Ct. Op. at 8.)

4

$77,000 back to debtors' accounts. (*Id.*) At trial, she testified that she used the remaining $27,000 to pay debtors' operating expenses; however, no other evidence supported Schneider's trial testimony about the net $27,000 that debtors had transferred to her personal bank account. (*Id.*)

B. Bankruptcy Proceedings

On April 29, 2009, a creditor of Janitorial filed an involuntary petition against Janitorial in the Bankruptcy Court. (*Id.* at 10.) The Bankruptcy Court issued an Order for Relief under Chapter 7 of the Bankruptcy Code on May 29, 2009. (*Id.* at 11.) By orders and judgments dated September 3, 2009, September 9, 2009, and March 29, 2010, Eager Beaver, All Clean LLC, Sax and Sounds, Ultimate Sax, All-Clean Janitorial and All Clean Corp. were substantively consolidated with Janitorial. (*Id.*) The Bankruptcy Court appointed the Trustee as interim trustee of Janitorial's estate on May 29, 2009. (*Id.*) The Trustee has since been appointed as the permanent trustee for all debtors' estates. (*Id.*)

The Trustee commenced an adversary proceeding against Laurie on June 5, 2009. (*Id.*; *see* Compl., *Barnard v. Eager Beaver Realty, LLC*, Adv. Proc. No. 8-09-08228-ast (Bankr. E.D.N.Y. June 5, 2009).) On April 12, 2010, the Bankruptcy Court entered a default judgment against Laurie in the amount of $13,061,632.53, plus interest. (Bankr. Ct. Op. at 11.)

The Trustee commenced the adversary proceeding at issue against Schneider on April 28, 2011. (*Id.*) Proceeding *pro se*, Schneider answered the complaint on May 31, 2011. (*Id.*) On January 4, 2013, after the parties had conducted discovery, Schneider retained counsel. On January 9, 2013, Schneider's counsel sought to amend Schneider's answer and assert nine new affirmative defenses. (*Id.* at 12.) The Trustee objected on the grounds that he would have been greatly prejudiced if Schneider could have amended her answer after the close of discovery. (*Id.*) On February 4, 2013, the Bankruptcy Court granted Schneider limited leave to file an amended answer, but denied her request to raise nine new affirmative defenses. (*Id.*)

The Bankruptcy Court held a one-day trial on March 14, 2013, at which the Bankruptcy Court heard testimony from Schneider and DuVal. (*Id.* at 13.) Thereafter, on June 24, 2013, the Bankruptcy Court issued its findings of fact and conclusions of law. The Bankruptcy Court concluded that the Trustee was entitled to avoid a total of $185,612.00 in transfers from debtors to Schneider. (*Id.* at 30.) $158,612.00 of that amount represents Rent Transfers made by debtors to Schneider during the period covering January 2007 to January 2009. (*Id.*) The remaining $27,000.00 represents the net amount Schneider received from the 2009 Transfers. (*Id.* at 31.) Judgment entered on July 8, 2013. (*See* R-18, Docket Sheet.)

C. Appeal

Appellant filed a notice of appeal in the Bankruptcy Court on July 8, 2013, which was docketed in this Court on September 10, 2013. Appellant filed her brief on December 23, 2013. Appellee filed his brief on January 6, 2014. Appellant filed her reply brief on January 22, 2014. The Court has fully considered the arguments and submissions of the parties.

II. STANDARD OF REVIEW

Rule 8013 of the Federal Rules of Bankruptcy Procedure provides that a reviewing court may "affirm, modify, or reverse a bankruptcy judge's judgment, order, or decree," or it may "remand with

instructions for further proceedings." Fed. R. Bankr. P. 8013.

The Court reviews the Bankruptcy Court's legal conclusions *de novo* and its factual findings for clear error. *See Denton v. Hyman (In re Hyman)*, 502 F.3d 61, 65 (2d Cir. 2007) ("The Bankruptcy Court's legal conclusions are reviewed *de novo* and its factual conclusions are reviewed for clear error."); *see Bankruptcy Servs., Inc. v. Ernst & Young (In re CBI Holding Co., Inc.)*, 529 F.3d 432, 449 (2d Cir. 2008); *Lubow Mach. Co. v. Bayshore Wire Prods. Corp. (In re Bayshore Wire Prods. Corp.)*, 209 F.3d 100, 103 (2d Cir. 2000); *Shugrue v. Air Line Pilots Ass'n, Int'l (In re Ionosphere Clubs Inc.)*, 922 F.2d 984, 988–89 (2d Cir. 1990). "'A finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.'" *Dist. Lodge 26, Int'l Ass'n of Machinists & Aerospace Workers, AFL-CIO v. United Techs. Corp.*, 610 F.3d 44, 51 (2d Cir. 2010) (quoting *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395 (1948)); *see also Collins v. Hi-Qual Roofing & Siding Materials, Inc.*, Nos. 02-CV-0921E(F), 02-CV-0922E(F), 2003 WL 23350125, at *4 n.16 (W.D.N.Y. Dec. 18, 2003) ("'[A] finding is only clearly erroneous when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. . . . This standard precludes this Court from reversing the Bankruptcy Court's decision if its account of the evidence is plausible, even if this Court is convinced that it would have weighed the evidence differently." (quoting *In re B. Cohen & Sons Caterers, Inc.*, 108 B.R. 482, 484 (E.D. Pa. 1989))).

III. DISCUSSION

The instant case concerns the fraudulent conveyance provisions of the New York Debtor and Creditor Law ("DCL") and its analogous provisions in the Bankruptcy Code. Under DCL §§ 270–281 and Bankruptcy Code § 548, a trustee may avoid two kinds of fraudulent transfers: (1) transfers made with an actual intent to hinder, delay, or defraud; and (2) transfers that the law considers to be fraudulent, *i.e.*, constructively fraudulent transfers. *Durand v. Ackerman*, No. 09-CV-3372 (JFB), 2010 WL 3834587, at *3 (E.D.N.Y. Sept. 27, 2010); *Bruno Mach. Corp. v. Troy Die Cutting Co. (In re Bruno Mach. Corp.)*, 435 B.R. 819, 852 (Bankr. N.D.N.Y. 2010).[4] The Bankruptcy Code allows a trustee to avoid transfers made up to two years before the date of the filing of the bankruptcy petition. *See* 11 U.S.C. § 548. The DCL allows for the avoidance of transfers made up to six years before the petition was filed. *See* N.Y. C.P.L.R. § 213(8); *Picard v. Estate of Chais (In re Bernard L. Madoff Inv. Sec. LLC)*, 445 B.R. 206, 231 (Bankr. S.D.N.Y. 2011) ("Although the New York statute of limitations for fraudulent conveyance actions allows a creditor to recover transfers made six years before the filing of the *complaint*, it is well established that once a bankruptcy petition is filed, section 546(a) of the Code is triggered, allowing a trustee to recover transfers made six years before the *petition date*." (emphasis in original) (collecting cases)). "Once a transfer has been avoided, Bankruptcy Code § 550 provides that the trustee/debtor-in-possession 'may recover for the benefit of the estate, the property transferred, or, if the court so orders, the value of such

---
[4] Bankruptcy Code § 544 allows for the avoidance of certain transfers that would be avoidable under state law. *See* 11 U.S.C. § 544(b)(1).

6

property . . . .'" *Inv. Advisors, LLC v. Barish (In re Geltzer)*, 502 B.R. 760, 767 (Bankr. S.D.N.Y. 2013) (quoting 11 U.S.C. § 550(a)).

Under these fraudulent conveyance laws, the Bankruptcy Court determined that the Trustee was entitled to avoid all Rent Transfers made on or after January 1, 2007 ($153,612.00), as well as the net amount of the 2009 Transfers that were transferred to Schneider's Chase Account ($27,000.00). Specifically, the Bankruptcy Court reached the following conclusions: (1) the foregoing transfers were actually fraudulent; (2) in the alternative, these transfers were constructively fraudulent; and (3) Schneider had not established a good faith defense. On appeal, Schneider raises issues in connection with all three of these conclusions. After reviewing each issue raised by Schneider on appeal, this Court affirms the judgment of the Bankruptcy Court.

A. Actual Fraud

1. Legal Standard

Bankruptcy Code § 548(a)(1)(A) and DCL § 276 allow a trustee to avoid transfers made by the debtor with the "actual intent" to "hinder, delay, or defraud" present or future creditors. 11 U.S.C. § 548(a)(1)(A)[5]; DCL § 276.[6] A debtor's "actual intent" is "rarely susceptible to direct proof." *Salomon v. Kaiser (In re Kaiser)*, 722 F.2d 1574, 1582 (2d Cir. 1983) (internal citation omitted). Instead, a factfinder must generally rely upon circumstantial evidence to ascertain the debtor's actual intent. *See, e.g.*, *id.* A trustee bears the burden of proving a debtor's actual intent to hinder, delay, or defraud creditors by clear and convincing evidence. *Kramer v. Sooklall (In re Singh)*, 434 B.R. 298, 311 (Bankr. E.D.N.Y. 2010); *Bruno Mach.*, 435 B.R. at 853; *see also United States v. McCombs*, 30 F.3d 310, 328 (2d Cir. 1994) (applying clear and convincing standard to DCL § 276).

The debtor's operation of a Ponzi scheme is strong circumstantial evidence of the debtor's actual intent to hinder, delay, or defraud creditors. Indeed, "transfers made by a Ponzi entity are presumed to have been made with actual intent to hinder, delay or defraud creditors under the relevant Bankruptcy Code provisions and applicable New York Debtor and Creditor law." *Silverman v. Meister Seelig & Fein, LLC (In re Agape World, Inc.)*, 467 B.R. 556, 570 (Bankr. E.D.N.Y. 2012). This Ponzi scheme presumption, according to which "the existence of a Ponzi scheme establishes that transfers were made with the intent to hinder, delay and defraud creditors," is "well

---

[5] Section 548(a)(1) provides, in relevant part:

> The trustee may avoid any transfer (including any transfer to or for the benefit of an insider under an employment contract) of an interest of the debtor in property, or any obligation (including any obligation to or for the benefit of an insider under an employment contract) incurred by the debtor, that was made or incurred on or within 2 years before the date of the filing of the petition, if the debtor voluntarily or involuntarily—
> (A) made such transfer or incurred such obligation with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer was made or such obligation was incurred, indebted[.]

[6] DCL § 276 states: "Every conveyance made and every obligation incurred with actual intent, as distinguished from intent presumed in law, to hinder, delay, or defraud either present or future creditors, is fraudulent as to both present and future creditors."

7

recognized" by courts in this Circuit and elsewhere. *Picard v. Merkin (In re Bernard L. Madoff Inv. Sec., LLC)*, 440 B.R. 243, 255 (Bankr. S.D.N.Y. 2010) [hereinafter *Merkin*]; *see, e.g.*, *Gowan v. Patriot Grp., LLC (In re Dreier LLP)*, 452 B.R. 391, 424 (Bankr. S.D.N.Y. 2011) ("Courts have uniformly recognized a presumption of actual intent to defraud on the part of the transferor in the context of a Ponzi scheme."); *Rieser v. Hayslip (In re Canyon Sys. Corp.)*, 343 B.R. 615, 637 (Bankr. S.D. Ohio 2006) (noting that "'bankruptcy [and other] courts nationwide have recognized that establishing the existence of a Ponzi scheme is sufficient to prove a Debtor's actual intent to defraud'" (brackets in original) (quoting *Bauman v. Bliese (In re McCarn's Allstate Fin., Inc.)*, 326 B.R. 843, 850 (Bankr. M.D. Fla. 2005))); *Gredd v. Bear, Stearns Sec. Corp. (In re Manhattan Inv. Fund Ltd.)*, 310 B.R. 500, 506 (Bankr. S.D.N.Y. 2002) (collecting cases).

The rationale for the Ponzi scheme presumption derives from the nature of a Ponzi scheme itself. "A 'Ponzi' scheme is any sort of fraudulent arrangement that uses later acquired funds or products to pay off previous investors." *Danning v. Bozek (In re Bullion Reserve of N. Am.)*, 836 F.2d 1214, 1219 n.8 (9th Cir. 1988); *see Merrill v. Abbott (In re Indep. Clearing House Co.)*, 41 B.R. 985, 994 n.12 (Bankr. D. Utah 1984) (defining a Ponzi scheme and describing its history), *aff'd in part, rev'd in part sub nom. Merrill v. Dietz (In re Universal Clearing House Co.)*, 62 B.R. 118 (D. Utah 1986). Because "[t]he investor pool is a limited resource and will eventually run dry," the Ponzi scheme operator "must know all along, from the very nature of his activities, that investors at the end of the line will lose their money." *Merrill v. Abbott (In re Indep. Clearing House Co.)*, 77 B.R. 843, 860 (D. Utah 1987). Accordingly, when a Ponzi entity transfers funds out of the Ponzi scheme, "only one inference is possible—namely, that the debtors had the intent to hinder, delay or defraud creditors." *Id.*

The Ponzi scheme presumption applies to almost all transfers made by a Ponzi entity. *See, e.g.*, *Manhattan Inv. Fund Ltd.*, 310 B.R. at 509 ("When a debtor operating a Ponzi scheme makes a payment with the knowledge that future creditors will not be paid, that payment is presumed to have been made with actual intent to hinder, delay or defraud other creditors—regardless of whether the payments were made to early investors, or whether the debtor was engaged in a strictly classic Ponzi scheme."). For example, in *Liebersohn v. Campus Crusade for Christ, Inc. (In re C.F. Foods)*, the bankruptcy court held that a debtor's transfers to a charitable organization were subject to the Ponzi scheme presumption. 280 B.R. 103, 111–12 (Bankr. E.D. Pa. 2002). The court addressed the requisite connection between the transfers and the Ponzi scheme as follows:

> In perpetrating the Ponzi scheme, Burry had to know that the monies from investors would eventually run out and that the payments to charities would contribute to the eventual collapse of the stratagem. Knowledge that future investors will not be paid is sufficient to establish actual intent to defraud them.

*Id.* at 111.[7]

---

[7] Of course, the transferee may still be able to invoke the good faith defense set forth in 11 U.S.C. § 548(c). *See, e.g.*, *C.F. Foods*, 280 B.R. at 111 ("It is also reasonable, and, in this case, appropriate, to infer that, *except for transfers to a person who took in good faith and for a reasonably equivalent value*, as

Despite the sweeping language in some decisions concerning the scope of the Ponzi scheme presumption, many courts have held that the transfers to be avoided must bear some connection to the Ponzi scheme. *See, e.g.*, *Kapila v. Phillips Buick-Pontiac-GMC Truck, Inc. (In re ATM Fin. Servs., LLC)*, No. 08-BK-969-KSJ, 2011 WL 2580763, at *5 (Bankr. M.D. Fla. June 24, 2011) ("Transfers made by the debtor unrelated to the Ponzi scheme do not warrant [the Ponzi scheme presumption]."); *Bear, Stearns Sec. Corp. v. Gredd (In re Manhattan Inv. Fund Ltd.)*, 397 B.R. 1, 11 (S.D.N.Y. 2007) (observing that "certain transfers may be so unrelated to a Ponzi scheme that the presumption should not apply"). For instance, one decision has held that, "[f]or the Ponzi scheme presumption to apply, the transfers must have been made *in connection with* a Ponzi scheme." *McHale v. Boulder Capital LLC (In re 1031 Tax Grp.)*, 439 B.R. 47, 72 (emphasis added), *supplemented*, 439 B.R. 78 (Bankr. S.D.N.Y. 2010). Other decisions have held that the transfers to be avoided must have been made "in furtherance of" the Ponzi scheme. *See, e.g.*, *Zazzali v. AFA Fin. Grp., LLC (In re DBSI, Inc.)*, 477 B.R. 504, 511 (Bankr. D. Del. 2012); *Cuthill v. Greenmark, LLC (In re World Vision Entm't, Inc.)*, 275 B.R. 641, 656 (Bankr. M.D. Fla. 2002).

2. Application

In the instant case, the Bankruptcy Court applied the Ponzi scheme presumption to conclude that debtors' harbored actual intent to hinder, delay, or defraud creditors. In particular, the Bankruptcy Court found that (1) Laurie commenced a Ponzi scheme on January 1, 2007; and (2) between January 1, 2007 and April 29, 2009 (the bankruptcy petition date), debtors transferred a net amount of $185,612.00 to Schneider in furtherance of that Ponzi scheme. On appeal, Schneider challenges both of these conclusions. In addition, the Bankruptcy Court determined that Schneider's intent, as transferee, was irrelevant for purposes of DCL § 276. Schneider also challenges this legal conclusion. The Court takes up each issue in turn.

a. The Beginning of the Ponzi Scheme

The Bankruptcy Court found that Laurie began to operate debtors as a Ponzi scheme on January 1, 2007. The Bankruptcy Court based this finding on the fact that Laurie began entering into written investment agreements on a regular basis beginning on January 1, 2007, and that "the execution of investor agreements continued and escalated through early 2009." (Bankr. Ct. Op. at 16.) The Bankruptcy Court specifically rejected Schneider's argument at trial that the Ponzi scheme did not begin until the middle of 2007. Contrary to Schneider's argument, the Bankruptcy Court found that "19 written investor agreements were executed between January 1 and June 30, 2007, thus demonstrating that the Ponzi scheme was well in progress before mid-2007." (*Id.*)

On appeal, Schneider argues that the Bankruptcy Court relied on "incomplete records" to select "an arbitrary date" for the beginning of the Ponzi scheme. (Appellant Br. 20.) This Court disagrees. In particular, the Court has reviewed the sworn statement and accompanying records of DuVal, the certified public accountant who reviewed debtors' financial records, prepared financial analysis, and opined that Laurie used debtors to operate a Ponzi scheme. (*See generally* DuVal Aff.) DuVal's analysis

---

described in . . . § 548(c) of the Bankruptcy Code, all other transfers made by the debtor during an on-going Ponzi scheme are part of the overall fraud." (emphasis added)).

shows that debtors executed eighteen investor agreements between January 1, 2007 and June 25, 2007. (*See* DuVal Aff. Ex. D.) Moreover, according to DuVal's analysis, as early as January 2007, debtors "did not maintain sufficient cash to meet the minimum investment principal obligations reflected in the investor agreements, which further reflects the increasing spread (deficit) and increasing insolvency." (*Id.* ¶ 65 & Ex. F.) Schneider does not dispute these facts; instead, she essentially asks this Court to conclude that Laurie had not commenced a Ponzi scheme by January 1, 2007 by weighing the facts in the record differently than the Bankruptcy Court did. However, even if this Court "might have weighed the evidence differently, it may not overturn findings that are not clearly erroneous." *Ivers v. Ciena Capital LLC (In re Ciena Capital LLC)*, 440 B.R. 47, 52 (S.D.N.Y. 2010) (quoting *Ceraso v. Motiva Enters., LLC*, 326 F.3d 303, 316 (2d Cir. 2003)). Here, in light of the foregoing evidence and the other evidence in the record, this Court is "not left with 'the definite and firm conviction that a mistake has been committed.'" *Republic Credit Corp. I v. Boyer (In re Boyer)*, 328 F. App'x 711, 716 (2d Cir. 2009) (quoting *United States v. Abiodun*, 536 F.3d 162, 166 (2d Cir. 2008)). In fact, the Bankruptcy Court's finding was well supported by the record. Accordingly, the Court does not disturb the Bankruptcy Court's finding that Laurie began using debtors to operate a Ponzi scheme on January 1, 2007.

### b. The Rent Transfers' Connection to the Ponzi Scheme

The Bankruptcy Court also determined that debtors had made the Rent Transfers in furtherance of the Ponzi scheme, such that they were subject to the Ponzi scheme presumption of actual fraudulent intent. Schneider disputes this determination, as well, contending that the Trustee failed to establish that the Rent Transfers were made in furtherance of Laurie's Ponzi scheme.[8]

As noted *supra*, decisions have not been consistent about the requisite nexus between the transfer and the Ponzi scheme. *Compare C.F. Foods*, 280 B.R. at 111 ("It is also reasonable, and, in this case, appropriate, to infer that, except for transfers to a person who took in good faith and for a reasonably equivalent value, as described in . . . § 548(c) of the Bankruptcy Code, *all other transfers made by the debtor during an on-going Ponzi scheme are part of the overall fraud*." (emphasis added)), *with DBSI*, 477 B.R. at 511 (holding that trustee must "show that the Transfers at issue were made in furtherance of the Ponzi scheme" (internal citations omitted)). This Court need not take a position on that issue. Even assuming *arguendo* that a transfer must be made "in furtherance of" the Ponzi scheme, the Court discerns no clear error in the Bankruptcy Court's finding that debtors made the Rent Transfers in furtherance of the Ponzi scheme.

The Bankruptcy Court found that the Rent Transfers were made in furtherance of the Ponzi scheme for two reasons. First, "the Rent Transfers provided very comfortable housing to Debtors' principal, Laurie and her husband, thus enabling them to project an appearance of success to Debtors' current and potential investors." (Bankr. Ct. Op. at 17.) Second, "the Rent Transfers conveyed a direct benefit to Laurie and Laybourne in the form of free housing, paid by Debtors, and using Ms. Schneider as the intermediate transferee." (*Id.* at 17.) With respect to the

---

[8] Schneider does not challenge the Bankruptcy Court's finding that the 2009 Transfers were made in furtherance of the Ponzi scheme. Accordingly, this Court need not address that issue.

first of these subsidiary findings, Schneider argues that there was no evidence introduced at trial establishing that any investor had been lured into the Ponzi scheme after observing the Oceanside Property. However, Schneider offers no basis on which to overturn the Bankruptcy Court's second subsidiary finding.

The Court affirms the Bankruptcy Court's "in furtherance" finding on the basis of the Bankruptcy Court's second finding alone, *i.e.*, that the Rent Transfers conveyed free housing to Laurie and Laybourne. Based on this undisputed finding, it is clear that the Rent Transfers from debtors to Schneider were a means by which Laurie extracted value from her Ponzi scheme to the detriment of investors. In other words, the Rent Transfers were one way that Laurie misappropriated the investments in debtors for her own benefit.[9] Surely transfers that enable a Ponzi scheme operator to profit from her own Ponzi scheme, and thereby perpetuate such a scheme, are "in furtherance of" a Ponzi scheme. Accordingly, the Bankruptcy Court did not err in finding that the Rent Transfers were made in furtherance of the Ponzi scheme.

c. Schneider's Intent

Finally, with respect to its actual fraud holding, the Bankruptcy Court determined that the intent of the transferee (here, Schneider) is irrelevant for purposes of Bankruptcy Code § 548(a)(1)(A) and DCL § 276. Schneider does not dispute that the transferee's intent is irrelevant under Bankruptcy Code § 548(a)(1)(A). *See, e.g.*, *Silverman v. Actrade Capital, Inc. (In re Actrade Fin. Techs. Ltd.)*, 337 B.R. 791, 808 (Bankr. S.D.N.Y. 2005) ("Cases under § 548(a)(1)(A) indicate that it is the intent of the transferor and not the transferee that is relevant for purposes of pleading a claim for intentional fraudulent conveyance under the Bankruptcy Code." (collecting cases)). However, Schneider maintains that DCL § 276 requires a trustee to establish that the transferee harbored the actual intent to hinder, delay, or defraud creditors.[10] This Court disagrees.

There is a split of authority over whether DCL § 276 requires proof of the transferee's fraudulent intent. *See, e.g.*, *Merkin*, 440 B.R. at 257 ("Under New York's actual fraudulent transfer statute, unlike under section 548(a)(1)(A) of the Code, courts differ as to whether a trustee must also plead a transferee's fraudulent intent." (collecting cases)). Many decisions have held that a trustee need only prove the transferor's intent to establish a prima facie case under DCL § 276. *See, e.g.*, *Thaler v. Korn*, No. 13-CV-3768 (SJF), 2014 WL 1154059, at *6 (E.D.N.Y. Mar. 19, 2014) ("'It is the intent of the transferor and not that of the transferee that is dispositive.'" (quoting *Sec. Investor Prot. Corp. v. Stratton Oakmont, Inc.*, 234 B.R. 293, 318 (Bankr. S.D.N.Y. 1999))). However, some decisions have required the trustee to prove the intent of the transferee, as well, under DCL § 276. *See, e.g.*, *Manhattan Inv. Fund*, 310 B.R. at 509 ("Under N.Y. D & CL section 276, a cause of action must allege fraudulent intent on the

---

[9] As the Bankruptcy Court found, this does not mean that Schneider was merely a conduit for debtors to convey a benefit to Laurie. The Rent Transfers also benefitted Schneider in that they covered the carrying cost of the Oceanside Property and the costs of the second mortgage on Schneider's own residence. (Bankr. Ct. Op. 17.)

[10] This issue matters because the Trustee was able to avoid those Rent Transfers made more than two years before the filing of the bankruptcy petition only pursuant to DCL § 276; as discussed *supra*, Bankruptcy Code § 548(a)(1)(A) limited the Trustee's recovery to transfers made within two years of April 29, 2009 (the petition date).

part of the transferor as well as the *transferee*." (emphasis in original)).

In this Court's view, the Bankruptcy Court correctly decided that DCL § 276 requires only proof of the transferor's fraudulent intent; the transferee's intent is relevant only to a good faith defense. The Court finds the *Dreier* decision particularly persuasive on this issue for three reasons. First, *Dreier* compared the language of DCL § 276, which allows a trustee to avoid "[e]very conveyance made and every obligation incurred with actual intent . . . to hinder, delay, or defraud either present or future creditors," with the language of DCL § 276-a, which provides for the recovery of attorneys' fees "where such conveyance is found to have been made by the debtor *and received by the transferee* with actual intent . . . to hinder, delay or defraud either present or future creditors" (emphasis added). *See* 452 B.R. at 433. The explicit reference to the transferee's intent in DCL § 276-a implies that the transferee's intent is irrelevant under DCL § 276. *Id.*; *see, e.g.*, *McInerney v. Rensselaer Polytechnic Inst.*, 505 F.3d 135, 138 (2d Cir. 2007) ("'[I]t is a general principle of statutory construction that when Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is . . . presumed that Congress acts intentionally and purposely . . . .'" (alterations in original) (quoting *Barnhart v. Sigmon Coal Co.*, 534 U.S. 438, 452 (2002))). Second, "[s]imilar to the affirmative defense available to a defendant under § 548(c), the transferee's intent is considered in connection with the affirmative defense under NYDCL § 278(1)." *Dreier*, 542 B.R. at 433; *see* DCL § 278 [11] ; *Balaber-Strauss v. Sixty-Five Brokers (In re Churchill Mortg. Inv. Corp.)*, 256 B.R. 664, 676 (Bankr. S.D.N.Y. 2000) (describing DCL § 276 as "parallel state-law provision" to Bankruptcy Code § 548(c)), *aff'd sub nom. Balaber-Strauss v. Lawrence*, 264 B.R. 303 (S.D.N.Y. 2001). Thus, the DCL as a whole does not ignore a transferee's actual fraudulent intent; however, it is not a requirement of DCL § 276, and the transferee bears the burden of proof on this issue at trial. *Dreier*, 452 B.R. at 434 (citing cases). Third, *Dreier* persuasively explains the mistaken origins of the requirement that DCL § 276 requires proof of the transferee's fraudulent intent. *Dreier* traced this requirement to *Gentry v. Kovler (In re Kovler)*, 249 B.R. 238 (Bankr. S.D.N.Y. 2000), which had relied upon two New York court decisions: *Anderson v. Blood*, 152 N.Y. 285 (1897), and *Key Bank of New York v. Diamond*, 611 N.Y.S.2d 382 (N.Y. App. Div. 1994). *See* 452 B.R. at 429–30. However, neither *Anderson* nor *Key Bank* stand for the proposition that DCL § 276 requires proof of a transferee's fraudulent intent. *Id.* Indeed, as *Dreier* observed, the *Kovler* decision was amended five years later to remove the statement concerning the required mutual fraudulent

---

[11] DCL § 278(1) states:

> Where a conveyance or obligation is fraudulent as to a creditor, such creditor, when his claim has matured, may, as against any person except a purchaser for fair consideration without knowledge of the fraud at the time of the purchase, or one who has derived title immediately or mediately from such a purchaser,
>
> a. Have the conveyance set aside or obligation annulled to the extent necessary to satisfy his claim, or
>
> b. Disregard the conveyance and attach or levy execution upon the property conveyed.

intent, as well as the references to *Anderson* and *Key Bank*. *See Gentry v. Kovler (In re Kovler)*, 329 B.R. 17, 18–19 (Bankr. S.D.N.Y. 2005). For these reasons, the Court concludes that DCL § 276 requires only proof of the transferor's fraudulent intent. *Accord Picard v. Cohmad Secs. Corp. (In re Bernard L. Madoff Inv. Sec. LLC)*, 454 B.R. 317, 331 (Bankr. S.D.N.Y. 2011) [hereinafter *Cohmad Secs. Corp.*] ("[T]he analysis since provided by the court in *Dreier* convincingly demonstrates that it is the transferor's intent alone, and not the intent of the transferee, that is relevant under NYDCL § 276." (internal quotation marks omitted)).

\* \* \*

In sum, this Court affirms the Bankruptcy Court's conclusion that the Trustee established by clear and convincing evidence that all Rent Transfers made on or after January 1, 2007, as well as the net amount of the 2009 Transfers that had been transferred to Schneider's Chase Account, were actually fraudulent conveyances under Bankruptcy Code § 548(a)(1)(A) and DCL § 276.

### B. Constructive Fraud

In addition to relying upon the actual fraudulent conveyance provisions of the Bankruptcy Code and the DCL, the Bankruptcy Court considered whether the Rent Transfers and 2009 Transfers could be avoided under a theory of constructive fraud. The Bankruptcy Court concluded that the Trustee could avoid all Rent Transfers and 2009 Transfers that had been made on or after January 1, 2007. To support this conclusion, the Bankruptcy Court found that debtors had received less than fair consideration for the Rent Transfers and 2009 Transfers to Schneider. Schneider contends that these findings are clearly erroneous. This Court disagrees and upholds the findings of the Bankruptcy Court.

### 1. Legal Standard

Bankruptcy Code § 548(a)(1)(B) permits a trustee to avoid transfers made by the debtor, even in the absence of the debtor's actual intent to hinder, delay, or defraud creditors, where two elements are met. First, the debtor must have "received less than a reasonably equivalent value in exchange for such transfer or obligation." 11 U.S.C. § 548(a)(1)(B)(i). Second, the debtor must have been either (a) "insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation"; (b) "engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital"; (c) "intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured"; or (d) "made such transfer to or for the benefit of an insider, or incurred such obligation to or for the benefit of an insider, under an employment contract and not in the ordinary course of business." *Id.* § 548(a)(1)(B)(ii). Similarly, under New York law,

> a conveyance by a debtor is deemed constructively fraudulent if it is made without "fair consideration,"[12] and (*inter*

---

[12] DCL § 272 provides that "[f]air consideration is given for property, or obligation, a. When in exchange for such property, or obligation, as a fair equivalent therefor, and in good faith, property is conveyed or an antecedent debt is satisfied, or b. When such property, or obligation is received in good faith to secure a present advance or antecedent debt in amount not disproportionately small as compared

13

*alia*) if one of the following conditions is met: (i) the transferor is insolvent or will be rendered insolvent by the transfer in question, DCL § 273[13]; (ii) the transferor is engaged in or is about to engage in a business transaction for which its remaining property constitutes unreasonably small capital, DCL § 274[14]; or (iii) the transferor believes that it will incur debt beyond its ability to pay, DCL § 275.[15]

*Sharp Int'l Corp. v. State Street Bank & Trust Co. (In re Sharp Int'l Corp.)*, 403 F.3d 43, 53 (2d Cir. 2005). The party seeking to set aside the transfers as constructively fraudulent bears the burden to prove the elements of constructive fraud by a preponderance of the evidence. *Bruno Mach.*, 435 B.R. at 854 (applying Bankruptcy Code § 548(a)(1)(B) and DCL §§ 272–75); *see Lippe v. Bairnco Corp.*, 249 F. Supp. 2d 357, 376 & n.6 (S.D.N.Y. 2003) (holding that plaintiff must prove constructive fraud under the DCL by a preponderance of the evidence); *aff'd*, 99 F. App'x 274 (2d Cir. 2004); *Dreier*, 452 B.R. at 436 (holding that trustee must prove constructive fraud under Bankruptcy Code § 548(a)(1)(B) by a preponderance of the evidence).

2. Application

a. Reasonably Equivalent Value or Fair Consideration

"Aside from the good faith element [of DCL § 272], courts have used the Code's 'reasonably equivalent value' interchangeably with the DCL's 'fair consideration' for purposes of analyzing constructive fraud claims under the Bankruptcy Code and the DCL." *Singh*, 434 B.R. at 309 (collecting cases); *see also Mendelsohn v. Roalef (In re E.D.B. Constr. Corp.)*, Adv. No. 13-8021-REG, 2013 WL 6183849, at *9 (Bankr. E.D.N.Y. Nov. 26, 2013). In order to satisfy the statutory requirements for "reasonably equivalent value" under Bankruptcy Code § 548 or "fair consideration" under the DCL, a conveyance must satisfy an antecedent debt or constitute a present exchange. *Pergament v. Reisner (In re Reisner)*, 357 B.R. 206, 214 (Bankr. E.D.N.Y. 2006) (citing 5 Collier on Bankruptcy ¶ 548.05[1][b]); *see HBE Leasing Corp. v. Frank*, 61 F.3d 1054, 1061 (2d Cir. 1995). While dollar-for-dollar equivalence is not required, the value of the consideration may not be "'disproportionately small' as compared to the value of the transferred property." *Lippe*, 249 F. Supp. 2d at 377.

The Second Circuit has applied the fair consideration requirement to cases where

---

with the value of the property, or obligation obtained."

[13] DCL § 273 states: "Every conveyance made and every obligation incurred by a person who is or will be thereby rendered insolvent is fraudulent as to creditors without regard to his actual intent if the conveyance is made or the obligation is incurred without a fair consideration."

[14] DCL § 274 states: "Every conveyance made without fair consideration when the person making it is engaged or is about to engage in a business or transaction for which the property remaining in his hands after the conveyance is an unreasonably small capital, is fraudulent as to creditors and as to other persons who become creditors during the continuance of such business or transaction without regard to his actual intent."

[15] DCL § 275 states: "Every conveyance made and every obligation incurred without fair consideration when the person making the conveyance or entering into the obligation intends or believes that he will incur debts beyond his ability to pay as they mature, is fraudulent as to both present and future creditors."

the debtor transfers property to a transferee, and the transferee gives the consideration to a third party instead of the debtor. In *HBE Leasing Corp. v. Frank*, the Second Circuit held:

> [W]hen a debtor transfers its property but the transferee gives the consideration to a third party, the debtor ordinarily will not have received fair consideration in exchange for its property. However, under the well established doctrine of *Rubin v. Manufacturers Hanover Trust Co.*, 661 F.2d 979 (2d Cir. 1981), the fact that the consideration initially goes to third parties may be disregarded to the extent that the debtor indirectly receives a benefit from the entire transaction.

48 F.3d 623, 638 (2d Cir. 1995). This rule applies to the fraudulent conveyance provisions of the Bankruptcy Code and the fraudulent conveyance provisions of the DCL. *Id.* Of course, even if the debtor indirectly received a benefit from such a three-way transaction, a trustee "could establish lack of fair consideration . . . by proving that the value of what the bankrupt actually received was disproportionately small compared to the value of what it gave." *Rubin*, 661 F.2d at 993.

### i. The Rent Transfers

In the instant case, the parties agreed at trial that the Rent Transfers reflected the approximate fair market rental value of the Oceanside Property. (Bankr. Ct. Op. 8.) Nonetheless, the Bankruptcy Court found that debtors did not receive fair consideration for the Rent Transfers because Schneider provided housing to Laurie and Laybourne, not debtors. (*Id.*) Specifically, the Bankruptcy Court rejected Schneider's trial testimony, in which she explained her belief that the Rent Transfers from debtors to Schneider had been part of debtors' compensation to Laurie and Laybourne. (*Id.* at 8; *see also* R-3, Aff. of Direct Testimony of Linda Schneider ¶ 12.) Contrary to Schneider's unsubstantiated belief, the Bankruptcy Court found that neither Laurie nor Laybourne reported the Rent Transfers as part of their compensation from debtors on their joint tax returns for 2005, 2006, and 2007. (Bankr. Ct. Op. at 8.) Moreover, the Bankruptcy Court found that debtors had not recorded all Rent Transfers in their financial records, and the Rent Transfers that had been recorded were categorized as either balance sheet liabilities or rent. (*Id.*)

Schneider offers no basis to overturn the Bankruptcy Court's finding on appeal. Indeed, Schneider does not even contest the foregoing facts on appeal; instead, she emphasizes her belief that debtors made the Rent Transfers to her in lieu of compensation to Laurie and Laybourne, and that debtors recorded at least some of the Rent Transfers as rent. (Appellant Br. 17.) However, the Bankruptcy Court was free to reject Schneider's trial testimony on the basis of other, contradictory evidence. *See, e.g.*, *Cavalry Constr., Inc. v. WDF, Inc. (In re Cavalry Const., Inc.)*, 428 B.R. 25, 29 (S.D.N.Y. 2010) ("In particular, '[t]he decisions as to whose testimony to credit . . . [are] solely within the provinces of the trier of fact . . . ." (alterations in original) (quoting *Ceraso*, 326 F.3d at 316–17)), *aff'd*, 425 F. App'x 70 (2d Cir. 2011). Moreover, the Bankruptcy Court did not commit clear error in finding a lack of fair consideration, notwithstanding Schneider's observation that the Oceanside Property benefitted debtors to the extent it contained a sound studio for Laybourne, who worked

for Ultimate Sax and Sax and Sounds. The Bankruptcy Court's finding that the Rent Transfers were not for debtors' benefit is amply supported, and "[i]t is not this Court's role to retry the case or to weigh the evidence as it sees fit." *Republic Credit Corp. I v. Boyer (In re Boyer)*, 384 B.R. 44, 48 (D. Conn. 2008), *aff'd*, 328 F. App'x 711 (2d Cir. 2009).[16] Accordingly, the Court upholds this finding of the Bankruptcy Court.

### ii. The 2009 Transfers

The Bankruptcy Court also found that debtors did not receive fair consideration for the $27,000.00 that was transferred to Schneider in 2009. (Bankr. Ct. Op. at 21.) As detailed *supra*, between February and April 2009, several debtors transferred a total of $77,000.00 to Schneider's personal bank account. (*Id.* at 9.) Schneider transferred only $50,000.00 back to debtors' accounts. (*Id.*) At trial, Schneider testified that she used the remaining $27,000.00 for expenses related to debtors' business operations. (*Id.* at 21.) The Bankruptcy Court found that her testimony was not credible. (*Id.* at 21–22.)

On appeal, Schneider argues that she "gave credible testimony" concerning her disposal of the $27,000.00 in question. (Appellant Br. at 20.) This argument has no merit on appeal, for the authority to discredit testimony lies solely within the trier of fact. *See, e.g.*, *Cavalry Constr.*, 428 B.R. at 29. There is no basis in the record to overturn the Bankruptcy Court's decision to discredit Schneider's testimony on this issue.

In the absence of Schneider's testimony, which the Bankruptcy Court discredited, the only evidence in the record shows that debtors transferred $77,000.00 to Schneider's personal bank account, and that Schneider moved only $50,000.00 to debtors' bank accounts. In light of these facts, the Bankruptcy Court did not err in determining that debtors transferred a net amount of $27,000.00 to Schneider without receiving fair consideration for the transfer.[17]

### b. Insolvency

Schneider does not dispute the Bankruptcy Court's finding that debtors were insolvent as of January 1, 2007, *i.e.*, the date the Ponzi scheme began. *See supra*. As many courts have noted, Ponzi schemes are, by definition, insolvent at all times. *See, e.g.*, *Ivey v. Swofford (In re Whitley)*, 463 B.R. 775, 784 (Bankr. M.D.N.C. 2012) (noting that, "by definition, Ponzi-style investment schemes are insolvent"); *Picard*

---

[16] The Court notes that the instant case differs significantly from *Geltzer v. Xaverian High School (In re Akanmu)*, 502 B.R. 124 (Bankr. E.D.N.Y. 2013), upon which Schneider relies on appeal. (*See* Appellant Br. 15–16.) The *Akanmu* decision held that the debtors' tuition payments to their children's school benefitted the debtors because (1) the debtors "satisfied their legal obligation to education their children," and (2) "the Debtors and their minor children must be viewed as a single economic unit for these purposes." *Id.* at 136. Here, debtors were not legally obligated to provide housing to Laurie and Laybourne, and there is no reason why debtors, Laurie, and Laybourne should be viewed as a single economic unit.

[17] Because the Bankruptcy Court held that debtors did not receive fair consideration for the Rent Transfers and 2009 Transfers, the Bankruptcy Court did not consider Schneider's good faith under DCL § 272. (Banrk. Ct. Op. at 20 n.19); *see, e.g.*, *Silverman v. Sound Around, Inc. (In re Allou Distribs., Inc.)*, 404 B.R. 710, 716–17 (Bankr. E.D.N.Y. 2009) (noting that "fair consideration" under DCL § 272 has two elements: (1) exchange of fair value and (2) good faith). Because this Court upholds the Bankruptcy Court's determination on fair consideration, "this Court need not reach the good faith determination." *Durand*, 2010 WL 3834587, at *6 n.6.

*v. Madoff (In re Bernard L. Madoff Inv. Sec. LLC)*, 458 B.R. 87, 110 n.15 (Bankr. S.D.N.Y. 2011) ("Contrary to the Defendants' position, [Bernard L. Madoff Investment Securities LLC] was insolvent at the time of the Constructive Fraudulent Transfers given that Ponzi schemes are, by definition, at all times insolvent."); *Daly v. Deptula (In re Carrozzella & Richardson)*, 286 B.R. 480, 486 (D. Conn. 2002) ("[A] number of courts have held that an enterprise engaged in a Ponzi scheme is insolvent from its inception and becomes increasingly insolvent as the scheme progresses." (collecting cases)).

\* \* \*

In sum, this Court affirms the Bankruptcy Court's alternative holding that the Trustee established by a preponderance of the evidence that all Rent Transfers made on or after January 1, 2007, as well as the net amount of the 2009 Transfers that had been transferred to Schneider's Chase Account, were constructively fraudulent conveyances under Bankruptcy Code § 548(a)(1)(B) and DCL §§ 272–275.

### C. Good Faith

"After a debtor makes out a prima facie case of actual or constructive fraudulent conveyance, a transferee nevertheless may avoid rescission of a transfer under Section 548(c) of the Bankruptcy Code . . . ." *Christian Bros. High Sch. Endowment v. Bayou No Leverage Fund, LLC (In re Bayou Grp., LLC)*, 439 B.R. 284, 308 (S.D.N.Y. 2010); *see, e.g.*, *Marshall v. Picard (In re Bernard L. Madoff Inv. Sec. LLC*, 740 F.3d 81, 90 n.11 (2d Cir. 2014). Bankruptcy Code § 548(c) provides, in relevant part, that

> a transferee or obligee of such a transfer or obligation that takes for value and in good faith has a lien on or may retain any interest transferred or may enforce any obligation incurred, as the case may be, to the extent that such transferee or obligee gave value to the debtor in exchange for such transfer or obligation.

11 U.S.C. § 548(c). Because Bankruptcy Code § 548(c) is an affirmative defense, the transferee bears the burden of establishing all elements of the good faith defense. *See, e.g.*, *Dreier*, 452 B.R. at 426; *Cohmad Secs. Corp.*, 454 B.R. at 331.

Here, Schneider raised the affirmative defense of good faith under Bankruptcy Code § 548(c). Without even reaching the issue of Schneider's good faith, the Bankruptcy Court concluded that the good faith defense was not available to Schneider because debtors received nothing of value in exchange for the Rent Transfers and 2009 Transfers. (Bankr. Ct. Op. at 25.) For the reasons discussed *supra*, the Court affirms the Bankruptcy Court's finding that debtors received nothing of value in exchange for the Rent Transfers. Accordingly, the Bankruptcy Court properly concluded that the affirmative defense of good faith under Bankruptcy Code § 548(c) was unavailable to Schneider. *See* 11 U.S.C. § 548(c) (good faith defense available only "to the extent that such transferee or obligee gave value to the debtor in exchange for such transfer or obligation").[18]

---

[18] Schneider does not challenge the Bankruptcy Court's conclusion that debtors received no value for the 2009 Transfers.

## IV. Conclusion

For the reasons set forth herein, the Court affirms the judgment of the Bankruptcy Court in its entirety. The Clerk of the Court shall close the case.

SO ORDERED.

_____
JOSEPH F. BIANCO
United States District Judge

Dated: April 2, 2014
       Central Islip, NY

\* \* \*

Appellant is represented by Christine Tara Quigley, Law Office of Christine T. Quigley, PC, 8 Commercial Street, Unit B, Hicksville, NY 11801. Appellee is represented by David A. Blansky, LaMonica Herbst & Maniscalco LLP, 3305 Jerusalem Avenue, Wantagh, NY 11793.